UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ELLIS LEE ROBINSON, JR.,

                Petitioner,

v.                                      CASE NO. 08-14866
                                      HONORABLE LAWRENCE P. ZATKOFF
THOMAS K. BELL,

                Respondent.
_____/

**OPINION AND ORDER**
**(1) GRANTING PETITIONER'S MOTIONS TO**
**SUPPLEMENT HIS HABEAS PETITION,**
**(2) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,**
**(3) DENYING A CERTIFICATE OF APPEALABILITY, AND**
**(4) DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

       This matter is pending before the Court on a *pro se* application for the writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  Petitioner Ellis Lee Robinson, Jr., challenges his Wayne County

convictions for murder and two firearm offenses.  Petitioner claims in his habeas petition that he was

denied effective assistance of appellate counsel, and he claims in two motions to supplement the

habeas petition that the prosecutor withheld exculpatory evidence from him.  The motions to

supplement the petition are granted, but the habeas petition is denied because Petitioner has failed

to show that his attorney's failure to raise certain claims on appeal prejudiced him and that the

prosecutor withheld material evidence.

**I.  BACKGROUND**

**A.  The Facts**

       Petitioner was charged with two counts of premeditated murder, two counts of felony

murder, one count of felon in possession of a firearm, and one count of possession of a firearm during the commission, or attempt to commit, a felony (felony firearm). The charges arose from the fatal shooting of thirty-six-year old William D. Harrison and thirty-one-year old Margaret ("Deb") McCarty on July 8, 2002.[1]  The two victims were employed at a restaurant known as Logan's Roadhouse in Livonia, Michigan. Petitioner was a former assistant kitchen manager at Logan's Roadhouse, but he was fired on June 6, 2002, after being convicted of embezzlement. Sometime around June 8 - 10, 2002, Petitioner went to his sister's house and picked up a rifle that he had left there after he moved out of the house.

On Monday, July 8, 2002, about 5:00 a.m., the two victims were taking inventory at Logan's Roadhouse. Someone threw a rock through the front window of the restaurant and then opened the front door. The intruder went to the back of the restaurant and shot each victim two times. All the money in the bottom safe (over $8,500) was taken, but the top safe was left untouched.

Other employees of Logan's Roadhouse arrived at work between 7:40 a.m. and 8:00 a.m. They noticed that something was wrong and called the police, who began their investigation shortly afterward. By midnight, Petitioner's fingerprint had been identified on a telephone, which the intruder was suspected of having removed from the restaurant's office and placed in a sink in the kitchen.

Meanwhile, Petitioner went to the house of his girlfriend, Natalie Anderson, and gave her $1,000 in cash. He told her that she could use the money however she liked and that she did not need to know where he acquired it. The two of them went shopping and later that day they counted

---

[1]  The prosecutor proceeded against Petitioner under two different theories: premeditated murder and murder committed during the commission of a larceny. Because of this, there were four counts of murder involving two victims.

about $3,000 in cash that Petitioner had in his bag.  When they saw a news report about the murders

on television, Petitioner told Ms. Anderson that he did not have anything to do with the incident.

 Several employees of Logan's Roadhouse implicated Petitioner in the robbery and murder.

They informed the police that Petitioner had been fired and that he had resented the fact that the

victims were promoted to a position over him.  The crime appeared to be an "inside" job because

someone knowledgeable about the restaurant's operations would have known that only two

employees were present at the restaurant early each Monday morning.  Only an insider would also

know that the bottom safe contained money and not the top safe.

 The police arrested Petitioner with Natalie Anderson on Thursday, July 11, 2002 .  His

clothes were taken from him at the jail, and he was given a blanket to wear.  At 9:00 a.m. on the

following day, Sergeant Thomas Goralski advised Petitioner of his constitutional rights and

interviewed him.  After Petitioner invoked his right to counsel, the interview stopped, and Petitioner

went back to his cell about 10:00 a.m.

 At about 12:30 p.m., as lunch trays were being handed out, Petitioner asked to speak with

the detective.  A police officer conveyed Petitioner's message to Sergeant Goralski, who returned

to speak with Petitioner about 12:50 p.m.  Petitioner assured Sergeant Goralski that he wanted to

speak with him and not a lawyer, but he asked whether he could first see his wife and children. A

family visit occurred that evening.

 Later that night, Petitioner made an oral and written statement in which he admitted to

shooting the two victims during a robbery.  He explained in his statement that he had been having

financial problems since his arrest on embezzlement charges and termination from Logan's

Roadhouse.  He went on to say that he had figured the only way he could get money was from

Logan's.  So, he got his shotgun, went to a club house, and then proceeded to Logan's about 4:30 or 4:45 a.m.  He recognized one of the cars outside Logan's, and he entered the building after tossing a rock through the glass.  Bill was doing inventory and did not see him.  Deb was in the office, and when he told her that he needed the money, she opened the safe and took out the money.  As they talked, he took the office telephone and put it in a red bucket.   Bill then approached the two of them and made rude comments to him.  He remembered shooting Bill, and when it was all over, both victims were lying on the floor.  He grabbed the money and ran out of the building.  He went home, changed his clothing, and put everything in a bag.  Then he drove to Pontiac where he discarded the bag of clothing and the live shells that he had taken with him from the crime scene.  He went to Ms. Anderson's house and put the shotgun in the garage behind a refrigerator.

Petitioner concluded his statement by stating that he was very remorseful, but that he had needed the money and had not intended to hurt anyone.  The police later found the shotgun where Petitioner said he had placed it.

### B.  The Motion to Suppress, Trial, Sentence, and Appeals

Before trial, Petitioner moved to suppress his confession.  The trial court held an evidentiary hearing over the course of several days and then denied the motion.  At trial, the prosecution established the facts outlined above, and the parties stipulated that Petitioner had a prior conviction for embezzlement and was not eligible to carry a firearm.  Petitioner did not testify or present any witnesses.  His defense was that he gave a false confession, that there could have been multiple perpetrators of the crime, and that, due to the lack of physical evidence linking him to the crime, the prosecution had failed to meet its burden of proof.

On February 14, 2003, a Wayne County Circuit Court jury found Petitioner guilty, as

charged, of two counts of premeditated murder, Mich. Comp. Laws § 750.316(1)(a), two counts of felony murder, Mich. Comp. Laws § 750.316(1)(b), one count of felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and one count of felony firearm, Mich. Comp. Laws § 750.227b. The trial court merged the murder counts and sentenced Petitioner to life imprisonment for the murders. Petitioner received a concurrent sentence of three years, two months, to five years for being a felon in possession of a firearm, and a consecutive term of two years in prison for the felony firearm count.

On direct appeal from his conviction, Petitioner argued that (1) the admission of his inculpatory statement to the police was improper and denied him a fair trial and (2) the trial court's improper evidentiary rulings deprived him of his right to present evidence supporting his defense. The Michigan Court of Appeals rejected these claims and affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See People v. Robinson*, No. 248098 (Mich. Ct. App. Jan. 13, 2005).

Petitioner raised the same claims and two new issues in the Michigan Supreme Court. The two new claims alleged that (1) Petitioner was denied due process of law as a result of an illegal arrest and (2) the cumulative effect of appellate counsel's actions deprived him of effective assistance of appellate counsel. On October 31, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Robinson*, 705 N.W.2d 129 (Mich. 2005) (table).

On July 24, 2006, Petitioner filed a motion for relief from judgment in the trial court. He alleged that he was denied his Sixth Amendment right to the effective assistance of appellate counsel. The trial court disagreed and denied Petitioner's motion. The Michigan Court of Appeals

denied Petitioner's subsequent application for leave to appeal on the ground that Petitioner had

failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v.*

*Robinson*, No. 282155 (Mich. Ct. App. Mar. 21, 2008).  On September 22, 2008, the Michigan

Supreme Court denied leave to appeal for the same reason.  *See People v. Robinson*, 755 N.W.2d

639 (Mich. 2008).

### C. The Habeas Petition, Responsive Pleading, and Motions to Supplement the Petition

Petitioner filed his habeas corpus petition on November 20, 2008.  His only claim alleges

ineffective assistance of appellate counsel.  Specifically, Petitioner claims that appellate counsel

failed to procure the entire trial court record and failed to present the Fifth and Sixth Amendment

issues that trial counsel had preserved for appellate review.  Respondent argues in an answer to the

habeas petition that Petitioner's claim is procedurally defaulted because he failed to raise it in the

appeal of right.

Appellate counsel could not be expected to raise the issue of his own ineffectiveness on

appeal.  *Munson v. Kapture*, 384 F.3d 310, 315 n.2 (6th Cir. 2004).  Even if Petitioner's

ineffectiveness claim was not procedurally defaulted, the claim lacks substantive merit, and

procedural default is not a jurisdictional limitation. *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir.

2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010).  The Court therefore will proceed to address

Petitioner's ineffective-assistance-of-counsel claim on the merits.

The Court will also address the prosecutorial-misconduct issue raised in Petitioner's two

motions to supplement the habeas petition.  Although Petitioner did not exhaust state remedies for

this claim, the claim lacks merit for reasons given below, and it would be a waste of time and

resources to require Petitioner to pursue additional remedies for his new claim in state court.

6

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct."  *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Id*. at 409.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 131

7

S. Ct. at 786.  To obtain a writ of habeas corpus from a federal court, state prisoners must show that

the state court's ruling on their claims "was so lacking in justification" that it resulted in "an error

well understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  *Id*. at 786-87.

### III.  DISCUSSION

### A.  Appellate Counsel

Petitioner alleges that he was deprived of his constitutional right to effective assistance of

appellate counsel.  Specifically, Petitioner claims that his appellate attorney did not have the

complete trial record when he pursued the appeal of right and did not present the claims that trial

counsel preserved at the state evidentiary hearing on Petitioner's motion to suppress his confession.

### 1.  Legal Framework

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly

established federal law for purposes of evaluating an ineffective-assistance-of-counsel claim.  *Cullen

v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011).   Under *Strickland*, an attorney is

constitutionally ineffective if his or her "performance was deficient" and "the deficient performance

prejudiced the defense."  *Strickland*, 466 U.S. at 687.  This standard applies to claims about

appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

> Failure of appellate counsel to raise an issue on appeal can amount to
> constitutionally ineffective assistance. *McFarland* [*v. Yukins*, 356 F.3d 688, 710 (6th
> Cir. 2004)].  Yet, counsel has no obligation to raise every possible claim and "the
> decision of which among the possible claims to pursue is ordinarily entrusted to
> counsel's professional judgment." *Id*.  An appellate attorney is not required to raise
> a non-meritorious claim.  *See Wilson v. Mitchell*, 498 F.3d 491, 514–15 (6th Cir.
> 2007).

*Jalowiec v. Bradshaw*, __ F.3d __, __, No. 08-3249, 2011 WL 3903439, at *26 (6th Cir. Sept. 7,

8

2011).

To prove the deficient-performance prong of *Strickland*, Petitioner must show that his appellate attorney was objectively unreasonable in failing to discover arguable issues to appeal and in failing to file a brief raising the issues. *Robbins*, 528 U.S. at 285. To satisfy the prejudice prong, Petitioner must demonstrate a reasonable probability that he would have prevailed on appeal were it not for his attorney's unprofessional errors. *Id*.

The Michigan Appellate Assigned Counsel System (MAACS) determined that Petitioner's appellate counsel violated five of their Minimum Standards for Indigent Criminal Appellate Defense Services. According to MAACS, appellate counsel: failed to conduct a personal interview with Petitioner in the initial stages of the representation; failed to promptly request and review all transcripts and lower court records; failed to comply with all applicable court rules regarding the timely filing of pleadings; failed to request oral argument; and did not keep Petitioner apprised of the progress of his case by providing him with the appellate brief.

The issue in this case, however, is whether appellate counsel was ineffective for failing to argue that Petitioner's arrest was invalid, that his confession was involuntary, and that the police violated the principles announced in *Miranda v. Arizona*, 384 U.S. 436 (1966). Although appellate counsel challenged the admission of Petitioner's confession, he did not address these specific issues, which trial counsel preserved at the evidentiary hearing on Petitioner's motion to suppress the confession. Appellate counsel also did not possess the complete trial court record, including two volumes of the transcript of the evidentiary hearing, before he filed his appellate brief. In order to determine whether these omissions amounted to constitutionally ineffective assistance of counsel, the Court must review the merits of Petitioner's claims about his arrest and confession. The Court

must then determine whether the state court's conclusion that Petitioner was not deprived of effective assistance of appellate counsel was contrary to, or an unreasonable application of, *Strickland*.

## 2. Probable Cause to Arrest

Petitioner argued through counsel at the state evidentiary hearing that the prosecution rushed to judgment and arrested him on the basis of mere suspicion. He claimed that the arrest occurred in the absence of a warrant or probable cause to support the arrest and that his confession should be suppressed because the arrest was illegal. The trial court concluded that the police did have probable cause to detain and arrest Petitioner.

"The Fourth Amendment forbids 'unreasonable searches and seizures,' and this usually requires the police to have probable cause or a warrant before making an arrest." *Herring v. United States*, 555 U.S. 135, 136 (2009). Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances "were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "The validity of the arrest does not depend on whether the suspect actually committed a crime . . . ." *Michigan v. DeFillippo,* 443 U.S. 31, 36 (1979).

Before Petitioner's arrest, the police knew that Petitioner had left a fingerprint on the office telephone at Logan's Roadhouse. Although Petitioner had once been employed there, he was terminated a month earlier, and his fingerprint overlapped other fingerprints on the telephone. This was an indication that his fingerprint was the most recent one. There was additional evidence that the telephone had been removed from its usual location and thrown in the sink. This evidence suggested that Petitioner moved the telephone during the robbery to prevent the victims from calling

for help.

At least five employees of Logan's Roadhouse informed the police on July 8 or 9, 2002, that they thought Petitioner was a possible suspect. The employees based their suspicions on the fact that Petitioner had been terminated from his job, was having financial difficulties, and had expressed resentment when the victims were promoted.

There were also reasons to believe that the crime was committed by an insider. According to employees of Logan's Roadhouse, someone familiar with the operation of the restaurant would have known that only two employees were present at 5:00 a.m. on Mondays and that the employees would deactivate the alarm system when they entered the building. An insider would also know that only the bottom safe contained money.

The Court concludes from the employees' statements and the fingerprint evidence that the police had sufficient information to believe Petitioner had a motive and an opportunity to commit the crime and probably did commit the robbery and murders. Therefore, probable cause existed to arrest Petitioner, and appellate counsel was not ineffective for failing to raise this issue in the appeal of right.

### 3. The *Miranda* Issue

Petitioner maintained at the pretrial evidentiary hearing that his constitutional rights were violated when Sergeant Garolski re-interrogated him after he invoked his right to counsel. He claimed that he merely made a request to see his family and that he was not properly advised of his constitutional rights before the second interrogation.

The trial court determined at the conclusion of the evidentiary hearing that Petitioner re-initiated communication with Sergeant Goralski and that Goralski then advised Petitioner of his

11

constitutional rights.  The trial court concluded that Petitioner's waiver of counsel was knowing and intelligent.

### a.  Clearly Established Law

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  "To give force to the Constitution's protection against compelled self-incrimination, the [Supreme] Court established in *Miranda* 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'"  *Florida v. Powell*, __ U.S. __, __, 130 S. Ct. 1195, 1203 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)).  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.

> After being informed of these rights, the individual may nevertheless choose to speak with police.  In that case, any of his subsequent statements may be used as evidence against him, provided the government can demonstrate that he "waived his privilege against self-incrimination and his right to retained or appointed counsel . . . [under the] high standards of proof [set] for the waiver of constitutional rights."  *Id.* at 475, 86 S.Ct. 1602 (citing *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).  This requires proof that the individual relinquished his rights voluntarily—as a "product of a free and deliberate choice rather than intimidation, coercion, or deception"—and knowingly—"with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*McKinney v. Ludwick*, __ F.3d __, __, No. 10-1669, 2011 WL 3628854, at *4 (6th Cir. Aug. 19, 2011).

If, on the other hand, the suspect  indicates at any stage of the process that he does not want

12

to be interrogated, the police may not question him. *Miranda*, 384 U.S. at 445. And if he states that

he wants an attorney, the interrogation must stop; "no subsequent interrogation may take place until

counsel is present . . . ." *Montejo v. Louisiana*, __ U.S. __, __, 129 S. Ct. 2079, 2089-90 (2009).

An exception exists when "the accused himself initiates further communication, exchanges, or

conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

> In other words, after an individual asks for counsel during interrogation, the government cannot demonstrate a valid waiver of this right absent the "necessary fact that the accused, not the police, reopened the dialogue with the authorities," *Edwards*, 451 U.S. at 486 n. 9, 101 S. Ct. 1880, by "evinc[ing] a willingness and a desire for a generalized discussion about the investigation," *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (plurality opinion).

*McKinney v. Ludwick*, 2011 WL 3628854, at *4.

### b. Application

Sergeant Thomas Goralski testified at the evidentiary hearing held in state court that he

advised Petitioner of his constitutional rights before interrogating Petitioner at 9:00 a.m. on Friday,

July 12, 2002. Petitioner initialed the waiver-of-rights form to signify that he understood his rights.

About an hour later, Petitioner stated to Goralski, "I don't want to talk any more. I think I need a

lawyer." Sergeant Goralski then asked, "Do you need a lawyer?" Petitioner responded, "Yes, I need

a lawyer." At that point, Goralski terminated the interrogation and turned Petitioner over to the

jailer.

According to police officer Scott Sczepanski, Petitioner asked to speak with a detective about

12:30 p.m. that day as lunch trays were being distributed to the inmates in jail. Petitioner said, "It's

very important. I think his name is Tom." Sergeant Goralski then returned and started a second

interview with Petitioner. Before talking about the case, however, Goralski attempted to clarify

Petitioner's intent.  Petitioner assured Goralski that he did not want an attorney and that he did want to speak with Goralski.

Goralski then briefly reviewed the constitutional rights form with Petitioner.  He did not read each individual right verbatim, but he did explain that they were the same rights which he had gone over previously.  He asked Petitioner to initial the form to signify that he was re-initiating the interview.  Petitioner complied with Goralski's request and stated that he intended to tell Goralski about the murders but that he wanted to see his family first.  A family visit was arranged for that evening.  Following the visit, Sergeant Goralski conducted a third interview with Petitioner. Petitioner then provided Sergeant Goralski with an oral and written confession.  He did not request a lawyer during that interview.

Petitioner gave a different version of the facts at the evidentiary hearing.  He denied asking to see his family during the second interview.  He claimed instead that Sergeant Goralski had told him something was wrong with his wife and children and that Goralski refused to give him any additional information about his family until he agreed to say that he re-initiated interview. Petitioner also claimed that Goralski did not go over his rights with him before the second interview. Petitioner testified that he ultimately made a statement because he was told that, if he did make a statement, (1) he would be able to see his wife and children, (2) his girlfriend, Natalie Anderson, would be released from jail, and (3) he could go home.  He also testified that Sergeant Goralski coached him as to what to write.

The trial court found the police officers' testimony to be more credible than Petitioner's testimony.  This determination on the credibility of witnesses is entitled to a presumption of correctness because Petitioner has not rebutted it with clear and convincing evidence.  28 U.S.C. §

14

2254(e)(1); *see also Miller v. Fenton*, 474 U.S. 104, 116-17 (1985) (explaining that state-court findings on subsidiary questions, such as an assessment of credibility, are conclusive on the habeas court if the findings are fairly supported by the record). Petitioner admitted at the evidentiary hearing that, during his brief visit with his wife, he did not ask her to contact a lawyer. Ms. Anderson also testified at the evidentiary hearing that she did not contact a lawyer for Petitioner after her release from jail even though she claimed to have heard Petitioner repeatedly request a lawyer when they were in jail together. In light of the fact that neither Petitioner, nor Ms. Anderson, requested a lawyer for Petitioner when given the opportunity, the trial court's determination that the defense witnesses were not credible is entitled to a presumption of correctness.

With that in mind, the weight of the evidence at the evidentiary hearing indicated that Petitioner was advised of his constitutional rights and waived his rights. He subsequently invoked his right to remain silent and his right to counsel, but he later evinced a willingness and desire to discuss the crime. He then reopened the dialogue with the police. At that time, he was reminded of his constitutional rights. He waived his rights a second time, and during the interview that followed his visit with family, he did not express a desire to remain silent or to see a lawyer.

The Court concludes that Petitioner's Fifth Amendment right not to incriminate himself and his Sixth Amendment right to counsel were not violated. As such, appellate counsel was not ineffective for failing to raise this issue on appeal.

### 4. The Voluntariness of Petitioner's Confession

Petitioner argued through counsel at the evidentiary hearing in state court that his confession was the product of psychological coercion. He maintained that he was kept isolated for almost twenty-four hours and that the police took his clothes to emasculate him. He also argued that the

15

police used his wife and children as a bargaining chip to induce the confession. The trial court did not find these arguments credible. The court determined at the conclusion of the evidentiary hearing that Petitioner's confession was the product of a free and voluntary choice.

### a. Clearly Established Federal Law

The test for voluntariness of a confession is whether

> "the confession [was] the product of an essentially free and unconstrained choice by its maker[.] If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). When determining whether a defendant's will was overborne in a particular case, courts must assess

> the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Id.* at 226 (citations omitted). Courts must "determine[] the factual circumstances surrounding the confession, assess[] the psychological impact on the accused, and evaluate[] the legal significance of how the accused reacted." *Id.* (citing *Culombe*, 367 U.S. at 603).

### b. Application

Petitioner was approximately thirty years old at his interrogation on July 12, 2002. He was a high school graduate and had completed a year and a half of schooling at a community college.

It was undisputed at the evidentiary hearing that Sergeant Goralski read Petitioner's constitutional rights to him before the first interview. Although Petitioner claimed at the evidentiary

hearing that he was not advised of his constitutional rights before the second interview, he apparently initialed the constitutional rights form a second time to signify that he was aware of his rights and wanted to waive them.  Sergeant Goralski was convinced that Petitioner understood his rights.

"[A] defendant faces an uphill climb when, as here, he argues that a confession was involuntary even though he properly received and waived his Miranda rights."  *Simpson v. Jackson*, 615 F.3d 421, 432 (6th Cir. 2010), *petition for cert. filed*, 79 U.S.L.W. 3246 (Oct. 4, 2010) (No. 10-458).  "[T]he facts of a given interview must be especially egregious to lead to the conclusion that a state court's application of Supreme Court involuntariness case law was unreasonable for purposes of habeas relief under AEDPA."  *Id*.

The other facts in this case do not lead to the conclusion that Petitioner's confession was involuntary.  Petitioner testified at the hearing that his jail cell was extremely cold and that he was not given any food or drink on his first day in jail.  Even if this were true, he did not arrive at the jail until about 2:00 p.m. on July 11, 2002, and jail records indicated that, on the following day, prisoners were fed four times, beginning at 6:30 a.m.  Petitioner had a toilet in his cell, and he admitted that he was permitted to smoke a cigarette on a few occasions.  The stop-action photographs taken of his cell indicate that he slept at some point, and, according the police, he did not appear to be under the influence of any substances.  It also does not appear that to the police used his family as an inducement to get Petitioner to testify, because Petitioner confessed after he saw his family.

Although the record indicates that all Petitioner's clothes, including his underwear, were taken from him and that he was given only a blanket and some slippers to wear, there is no evidence

that this was done to weaken his resolve.  The clothes apparently were taken as possible evidence, and the jailer initially could not find any substitute clothes for Petitioner.  Petitioner denied being cold during the interview with Sergeant Garolski, and he received a jumpsuit later that afternoon. He was dressed by the time his family visited him and before his subsequent conversation with Sergeant Goralski when he confessed.

The first interview lasted about an hour, and the second interview apparently was short also, because Petitioner asked to see his family before saying anything about the case.  The third interview was longer, but the officer, who observed the interview through a closed circuit television, testified at the evidentiary hearing that Petitioner took a few breaks.  During one break in the interview, Petitioner complimented the officers for being gentlemen and for treating him humanely.  He also stated that he had to sleep in the bed that he had made and that he had hurt a lot of people.  His written confession states that his statement was voluntary.

The Court concludes from the totality of the circumstances that Petitioner's confession was voluntary, not coerced.  Consequently, appellate counsel was not ineffective for failing to raise this issue on appeal.

### 5.  Conclusion on Petitioner's Ineffectiveness Claim

The trial court opined on review of Petitioner's claim about appellate counsel that counsel's failure to raise certain issues preserved by trial counsel was not evidence of ineffective assistance. Petitioner has failed to prove that this ruling was an objectively unreasonable application of *Strickland*.

Even if appellate counsel's performance was deficient, there is not a reasonable probability that the outcome of Petitioner's appeal would have been different had his appellate attorney obtained

18

the full trial record and presented the specific arguments made at the evidentiary hearing. Therefore, the allegedly deficient performance did not prejudice Petitioner's appeal. The Court declines to issue the writ of habeas corpus on the basis of Petitioner's claim about appellate counsel.

### B. The Prosecutor

In his motions to supplement the habeas petition, Petitioner claims that the prosecutor withheld evidence from him. Petitioner purports to have newly-discovered evidence consisting of the medical examiner's investigative reports. Petitioner claims that the reports are proof of his innocence.

The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

According to Petitioner, the medical reports he recently acquired show that the police staged the crime scene by moving the victims' bodies before the county medical examiner arrived. Petitioner also concludes from the reports that the police did not notify the medical examiner until over four hours after the police arrived on the scene. These facts, even if true, are insignificant and shed no light on the ultimate issue at trial: whether Petitioner killed William Harrison and Margaret McCarty. Thus, the newly discovered evidence is not exculpatory.

Even if the newly-discovered evidence could have been used to impeach prosecution

19

witnesses regarding the location of the bodies, the evidence against Petitioner, including his confession, was overwhelming. There is not a reasonable probability that the allegedly suppressed evidence would have produced a different verdict. Consequently, Petitioner has failed to establish a true *Brady* claim.

## IV.  CONCLUSION

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. Accordingly, the petition for a writ of habeas corpus [Dkt. #1] is **DENIED**.

The Court further **DENIES** a certificate of appealability on Petitioner's claim that his appellate attorney was ineffective because reasonable jurists could not debate the Court's resolution of that claim. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). The Court also **DENIES** a certificate of appealability on Petitioner's *Brady* claim because that claim does not deserve encouragement to proceed further and reasonable jurists could not debate whether the issue should have been resolved differently. *Id*. Petitioner may not proceed *in forma pauperis* on appeal because his claims lack merit, and such an appeal could not be taken in good faith. 28 U.S.C. § 1915(a)(3). Finally, as noted above, Petitioner's motions to supplement the habeas petition [dkt. #12 and dkt. #13] are **GRANTED**.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  September 28, 2011

20

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on September 28, 2011.

S/Marie E. Verlinde
Case Manager
(810) 984-3290